**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Rag & Bone Holdings, LLC and RB
Topco Sagl,

      Plaintiffs,

     v.

Miramar Brands Group, Inc.,

      Defendant.

      Case No. 1:25-cv-09937-LGS

———————————————

### **Defendant's Opposition to Motion for Preliminary Injunction**

  Defendant Miramar Brands Group, Inc. ("MBG") opposes hereby the

motion for preliminary injunction filed by Plaintiffs Rag & Bone Holdings, LLC

and RB Topco Sagl ("Rag & Bone").[1]

### **Factual Background**[2]

  Plaintiff Rag & Bone is a multi-million dollar company headquartered in

New York, while Defendant MBG is a two-person, founder-led, privately-held

---

[1] MBG also has filed a motion to dismiss this action for lack of proper personal
jurisdiction and/or venue under Rules 12(b)(2) and 12(b)(3).

[2] The Court requested that "the parties should note in their filings whether there are
disputed issues of fact requiring an evidentiary hearing, in addition to oral
argument." *See* ECF No. 7. MBG respectfully submits that as demonstrated
herein and in the accompanying declarations, indeed there are numerous disputed
issues of fact requiring an evidentiary hearing and oral argument. Because of pre-
existing scheduling conflicts including business travel to Florida (week of
February 2-6) and Washington (week of February 10-13), MBG respectfully
requests that such a hearing and argument be set no sooner than February 16, 2026.

California corporation, with its only place of business in Southern California and no offices, employees, retail locations, targeted commercial activities or any other significant business activities in this District or New York generally.  MBG was founded in 1983 by, among others, its principal Stephen Yount Ascher, Jr. together with renowned volleyball Olympian and sports/lifestyle legend Christopher St. John "Sinjin" Smith.  *See* Ascher Decl. ¶ 2.[3]  MBG owns and licenses a portfolio of registered trademarks and sports-entertainment formats globally, including the MIRAMAR® brand, KING OF THE BEACH®, KING OF THE COURT®, and related apparel, athleisure and lifestyle goods, and globally promoted sports and media events.  *See id.* ¶ 3.

MBG's official websites include miramarbrands.com, miramarstores.com, miramar.shop, miramarmarine.com, miramarofficial.com, miramardenim.com, kingofthebeach.com, kingofthecourt.com and queenofthesnow.com.  MBG's social media handles include @miramar, @miramarfilm, @kingofthebeachusa, @queenofthebeachusa and others.  MBG's foundational and longstanding brands include MIRAMAR®, SIDEOUT®, QUEEN & KING OF THE BEACH®, QUEEN & KING OF THE COURT® and QUEEN & KING OF THE SNOW® used in connection with apparel, sportswear, lifestyle goods, accessories and

---

[3] Filed herewith are the Declarations of Stephen Y. Ascher, Jr. (including Exhibits A-J) and many others, all referenced herein.

globally-promoted sports and media events (collectively the "Crown Brands").  *See id.* ¶ 4, Ex. A (selected pages from MBG's websites).

MBG's core business is the licensing, management, and protection of its intellectual property portfolio.  Over decades, MBG has provided brand management, licensing and consulting services in fashion, sports, and global retail-media networks to long-term partners including Hearst Corporation and Lagardère.  MBG also held minority ownership or investment interests in certain heritage lifestyle brands and has structured and managed collaborations involving globally recognized brands, generating substantial retail revenues over many years.  *See id.* ¶ 5.

MBG's brands including MIRAMAR® are the primary trademarks used in connection with MBG's collaboration and sponsorships of the primary worldwide professional beach volleyball tours, called "Queen & King of the Beach®" and "Queen & King of the Court®" which cater to the 25-35 year old global consumer and athleisure sports enthusiasts.  The MIRAMAR® trademark appears extensively on signage and most clothing worn in connection with these amateur and professional beach volleyball events and tours and related activations, including ELLE-branded beach lifestyle integrations in collaboration with MBG.  *See id.* ¶ 6.  MBG has taken measured and consistent steps and actions to protect and police its global trademark rights, including preventing others from conflicting

uses.  For example, based on MBG's longstanding use of its MIRAMAR®
trademark alone and, at minimum, its U.S. trademark use and priority dating back
to no later than 2009, MBG has been granted many trademark registrations
including (a) incontestable U.S. Trademark Registration No. 3,891,117 ("the '117
Registration") for MIRAMAR (stylized), and (b) incontestable U.S. Trademark
Registration No. 3,891,118 ("the '118 Registration") for MIRAMAR®.  Both of
these registrations were granted in 2010, and both are in International Class 25 for
clothing, including "swimwear, tops, shirts, T-shirts, sweatshirts, tank tops, vests,
blouses, coats, overcoats, suits, jackets, sports coats, sweaters, pullovers, jumpers,
skirts, dresses, body suits, leotards, leggings, pants, trousers, sweatpants, shorts,
gloves, socks, underwear, and belts; headwear, namely, caps, hats, and visors;
footwear, namely, shoes and sandals, sleepwear, athletic uniforms, in Class 25."
MBG has also been granted European Union Trademark Registration No.
015811541.  *See id.* ¶ 7, Exs. B-C (incontestable trademark registrations).

MBG has a long and well-documented history of protecting its incontestable,
registered trademarks through appropriate legal and administrative channels when
necessary, including seeking court relief against substantially larger entities.  For
example, MBG previously enforced the SIDEOUT® trademarks in a widely-
reported dispute against Nike's infringing "SIDE ONE" branding, a classic
"David-versus-Goliath" matter that resulted in the cessation of Nike's infringing

use.  MBG has enforced its Crown Marks consistently for decades—prevailing against global apparel conglomerates, individual infringers, and junior registrants alike—while maintaining a restrained, injunctive-focused enforcement posture. *See id.* ¶ 8.

MBG's measured approach to trademark enforcement was further confirmed in *Miramar Brands Group, Inc. v. Fonoimoana*, Case No. 16-cv-04224 (C.D. Cal.), a federal action involving Eric Fonoimoana and a junior party's attempted appropriation of MBG's Queen-format Crown Marks in connection with beach volleyball events.  There, MBG sought only injunctive relief to halt infringing use and expressly waived any claim for monetary damages, underscoring that MBG's objective was protection of brand integrity—not financial leverage.  During proceedings, this Court repeatedly rejected the junior party's reliance on later trademark registrations and rejected efforts to curtail MBG's senior rights, confirming that MBG lawfully owned and controlled the relevant Crown Marks and that the junior party's contrary position was untenable.  The Court further recognized the inherent logical relationship among MBG's Crown Marks— acknowledging that Queen-formative marks naturally relate to and derive from MBG's senior King-formative marks—and dismissed belated attempts to inject abandonment or reverse-confusion theories.  MBG ultimately prevailed, confirming that its Crown Marks function as a unified family and that MBG

enforces those rights in a consistent, restrained, and judicially approved manner. *See id.* ¶ 9.

MBG's enforcement efforts have also extended to protecting its marks in connection with major media and real-estate developments, including requiring changes to third-party branding in the feature film *Father of the Bride*.  MBG resolved trademark issues involving Caruso Property Management through proceedings before the United States Patent and Trademark Office including a negotiated resolution permitting limited, differentiated uses.  *See id.* ¶ 10.  This consistent history of measured enforcement underscores that MBG's actions here are part of a longstanding practice of protecting its intellectual property in an even-handed manner.  *See id.* ¶ 11.

MBG has licensed, has minority interests in and/or has entered into long-term partnership agreements involving the MIRAMAR® trademark with many companies, including Spalding (a Berkshire Hathaway company), Fruit of the Loom and its Russell Brands division, Vanity Fair brands and Union Underwear, Lagardère and Hearst's ELLE and ELLE Decor brands, American Brand Holdings and its Hang Ten® brand, Mikasa Corporation, Sportworx B.V. in The Netherlands, the Fédération Internationale du Volleyball ("FIVB"), and The Amateur Athletic Union of the United States ("AAU").  MBG also has pending license, partnership, collaboration and/or other agreements, including with

Northaven Brand Holdings for sportswear and athleisure apparel, and Smack Sportswear for activewear.  MBG's partnerships and brand value have been adversely impacted by Rag & Bone's infringing use of MIRAMAR.  *See id.* ¶ 12.

MBG's clothing items are sold under long-term licenses online as well as retail outlets that include Amazon, TikTok, Meta, Target, WalMart, MBG's own websites and social media handles, major sporting goods and retail outlets, both online and brick-and-mortar.  MIRAMAR®-branded items include t-shirts, sweatshirts, hoodies, joggers, headwear, accessories, volleyballs, denim hats and jackets.  MBG's products are typically priced at premium levels and cater to 25-35 year old athleisure and sports enthusiasts worldwide; for example, a sweatshirt for $88.50, sweatpants for $77.50, t-shirts for $32-60, a bomber jacket for $650, net systems for over $1,000 and premium, genuine leather beach volleyballs for over $99.  *See id.* ¶ 13, Ex. D.

### Rag & Bone's Recent Adoption of "MIRAMAR" As A Brand

On April 2, 2024, Rag & Bone executed an Intellectual Property Assignment Agreement unrelated to, and expressly excluding, any rights in or goodwill associated with the MIRAMAR name.  Nevertheless, Rag & Bone started using the MIRAMAR brand online without permission beginning in or about mid-2025, and to such an extent that MBG started losing its visibility and brand association across major online platforms including Amazon, Google, eBay, Yahoo, Meta, TikTok

and other digital search and commerce channels, for example in search results for "MIRAMAR" and "MIRAMAR + CLOTHING." The confusion and resulting harm related to MIRAMAR-branded products and clothing has accelerated in recent weeks, materially harming the value of MBG's MIRAMAR® brand and others that it owns or controls. There is representative marketplace and search-result displacement evidence. *See id.* ¶ 14, Exs. E-G.

As the senior and incontestable owner of the MIRAMAR® brand and trademarks, MBG is expressly entitled — and in many instances required — by major digital commerce and social media platforms, including Amazon and Meta, to participate in brand-registry programs designed to prevent U.S. and international consumer confusion, counterfeiting, and trademark infringement. These programs operate through automated and semi-automated enforcement systems governed by platform Terms of Service ("TOS") that prohibit unauthorized use of registered marks. MBG does not target individual sellers or employees of third-party companies; rather, enforcement actions are initiated and processed pursuant to platform trademark policies once infringing uses are detected. *See id.* ¶ 15. Rag & Bone's employees' subsequent complaints and demands that MBG "retract" enforcement actions — many of which MBG did not initiate or control — reflect the operation of platform-controlled brand-protection mechanisms and trademark law, not any misconduct by MBG. Rag & Bone's rush to federal court to halt

lawful enforcement thus represents an effort to weaponize judicial process to preserve and expand its infringing use of MIRAMAR®, rather than a legitimate response to any wrongful conduct by the senior mark owner. *See id.* ¶ 16.

This action presents a classic case of reverse confusion, in which a powerful junior user has adopted and promoted a mark in a manner that overwhelms and displaces the identity of a senior California brand. Rag & Bone is a New York-based fashion house that chose to use the MIRAMAR name recklessly, without clearing the name and without acquiring any rights to use MBG's already-existing brands. As a result of Rag & Bone's extensive marketing and online "saturation" beginning in mid-2025, consumers increasingly associate the name MIRAMAR with Rag & Bone rather than with MBG, the owner of the brand. Rag & Bone adopted MIRAMAR in 2025 as a collection and brand signifier to generate market momentum in core apparel categories, notwithstanding MBG's senior rights. *See id.* ¶ 17.

### **USPTO Refusal Confirms Likelihood Of Confusion**

On June 9, 2025 Rag & Bone filed U.S. Trademark Application Serial No. 99224195 for the proposed trademark RAG & BONE / MIRAMAR. Rag & Bone acknowledged that it had not yet used MIRAMAR as an asserted trademark; rather, it stated its "intent to use" the mark. *See id.* ¶ 18. Recently on October 30, 2025, the U.S. Patent and Trademark Office ("USPTO") rejected the application via a

"Section 2(d) Refusal—Likelihood of Confusion" for many reasons, primarily

based on MBG's '117 Registration and '118 Registration.  *See id.* ¶ 19, Ex. H.  In

the Office Action, the USPTO made findings and conclusions including the

following.  As the Office Action explained:

> Trademark Act Section 2(d) bars registration of an applied-for mark
> that is so similar to a registered mark that it is likely consumers would
> be confused, mistaken, or deceived as to the commercial source of the
> goods and/or services of the parties.  *See* 15 U.S.C. §1052(d).
> Likelihood of confusion is determined on a case-by-case basis by
> applying the factors set forth in *In re E. I. du Pont de Nemours & Co.*,
> 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973) (called the
> "*du Pont* factors"). . . .  Although not all *du Pont* factors may be
> relevant, there are generally two key considerations in any likelihood
> of confusion analysis: (1) the similarities between the compared
> marks and (2) the relatedness of the compared goods and/or services.

*See id.* ¶ 19, Ex. H at 6.

Concerning the factor of "Similarity of the Marks," the USPTO concluded:

"In this case, both marks share the similar wording, MIRAMAR.  This similarity

creates a confusingly similar commercial impression because consumers are likely

to believe that registrant's mark is a condensed form of applicant's mark or that

registrant has begun offering similar goods and services under another iteration of

its registered mark.  Thus, the addition of wording does not create a distinct

commercial impression that distinguishes applicant's mark from registrant's

mark."  *See id.* ¶ 21, Ex. H at 6-10.  Concerning the factor of "Relatedness of the

Goods and Services," the USPTO concluded: "The attached Internet evidence

establishes that the same entity commonly manufactures, produces, or provides the relevant goods and/or services and markets the goods and/or services under the same mark.  Thus, applicant's and registrant's goods and/or services are considered related for likelihood of confusion purposes. . . .  The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered together in the marketplace by consumers.  Accordingly, consumers are likely to be confused and mistakenly believe that the products and services originate from a common source. Therefore, registration must be refused."  *See id.* ¶ 22, Ex. H at 10-12.

Rag & Bone has requested an extension of time to respond to the Office Action, but historically it is unlikely Rag & Bone would be able to overcome the USPTO's refusal to approve the application to register.  In the meantime, Rag & Bone has continued and expanded its MIRAMAR rollout notwithstanding MBG's August 28, 2025 cease-and-desist letter.  In this action, Rag & Bone has asserted many allegations, including that "Rag & Bone at no time has committed trademark infringement [because] there is no reasonable argument that confusion is even likely."  Rag & Bone did not address the USPTO's October 30, 2025 findings regarding likelihood of confusion, however, because no defense to those findings is plausible.  *See id.* ¶ 23.

The Rag & Bone MIRAMAR product line "includes among other things, pants, shorts, shirts, dresses, and T-shirts," as admitted in this action. Beginning in 2025, Rag & Bone expanded promotion of its infringing MIRAMAR line that has become popular with consumers, to the point that searches for "MIRAMAR clothing" prominently display Rag & Bone's MIRAMAR products in sponsored and paid search results ahead of MBG's products and official websites. Rag & Bone's clothing items are sold online as well as in retail outlets including Amazon, Google, T.J. Maxx, and other places in competition with MBG's clothing items. Rag & Bone's items are typically priced at premium levels; for example, sweatpants priced approximately $100-$200. *See id.* ¶ 24, Ex. I.

Already there have been several examples of actual confusion. For example, several individuals including Mr. Theodore Jaffrey, Mr. Moses Khuu and Mr. Dale Waters have contacted MBG and asked about Rag & Bone's use of MBG's MIRAMAR brand. *See id.* ¶ 25, Ex. J; Jaffrey Decl. ¶¶ 2-14; Khuu Decl. ¶¶ 2-7; Waters Decl. ¶¶ 2-11. The examples of real consumer confusion are coming in now more and more, day after day, proving the real irreparable brand harm that MBG is experiencing and suffering. *See* Kusnetz Decl. ¶¶ 2-12; Lorber Decl. ¶¶ 2-8; Smith Decl. ¶¶ 2-15; Valero Decl. ¶¶ 2-12.

Rag & Bone's infringing use of Miramar® and its ensuing efforts to mischaracterize lawful brand-registry enforcement have also caused reputational

harm to MBG's long-standing commercial relationships.  For example, a senior executive of Nordstrom — a retail partner with whom MBG has maintained a trusted relationship for decades — contacted MBG directly to question why infringement issues had arisen at all, reflecting confusion and concern generated by Rag & Bone's conduct rather than any change in MBG's even-handed enforcement practices.  At the same time, searches for "Miramar" on major retail platforms, including Nordstrom.com and other retail partners, continued to surface Rag & Bone's MIRAMAR-branded products notwithstanding MBG's proper enforcement efforts.  This distortion of marketplace signals and strain on established business relationships constitutes irreparable harm to MBG's goodwill and reputation that cannot be remedied by monetary damages alone.  Through its reckless adoption and saturation use of MIRAMAR, Rag & Bone has collapsed the integrity of MBG's long-standing brand relationships, including relationships that had remained stable and uncontested for decades prior to Rag & Bone's infringement. *See id.* ¶ 26.

Rag & Bone's infringing use of "MIRAMAR" has been amplified in reputable fashion and mainstream consumer press within the Hearst publishing ecosystem.  ELLE Magazine published a Black Friday feature highlighting Rag & Bone's "Miramar" sweatpant jeans collection as a shopping pick, without reference to MBG's senior and incontestable MIRAMAR® brand.  *See* Ex. F.  This

misattribution is particularly injurious because ELLE Magazine is owned by Hearst, a long-standing editorial and commercial partner within MBG's brand-and-licensing ecosystem.  Even more striking, in a nationally distributed issue of Oprah's Daily—a Hearst publication—Rag & Bone's "MIRAMAR" jeans were selected and featured as an editorial shopping "pick," again without reference to MBG's senior MIRAMAR® brand.  *See* Ex. G.  These unpaid editorial placements underscore the immediacy and severity of the reverse-confusion harm: Defendants' junior use is being amplified by reputable third parties, causing consumers to associate "MIRAMAR" with Rag & Bone rather than with MBG. These examples further reflect marketplace exposure to Rag & Bone's MIRAMAR branding through trade-press and retail-media coverage and related marketplace displacement evidence.  *See id.* ¶ 27.

Based on the foregoing, MBG is the senior owner of its incontestable, registered MIRAMAR® trademarks, having used the marks continuously for decades in connection with its California lifestyle apparel, sports, and global brand extensions.  Rag & Bone, a national fashion retailer and marketer, knowingly and recklessly adopted MIRAMAR as a collection name and brand signifier in 2025. By saturating the market through national retail distribution, paid digital advertising, influencer campaigns, and algorithm-driven promotions, Rag & Bone has caused consumers to believe—incorrectly—that MBG's senior brand

MIRAMAR® is affiliated with, derived from, or subordinate to Rag & Bone. The harm to MBG is already occurring and is accelerating, as confirmed by platform-level confusion across Amazon, Meta and Google, including search-engine displacement that has effectively erased MBG's MIRAMAR® brand identity online. *See id.* ¶ 28.

## **Legal Standards**

Rag & Bone's requested preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (internal citations omitted). "To obtain a preliminary injunction, a party must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

"The Lanham Act prohibits the use in commerce, without consent, of any 'registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods,' in a way that is likely to cause confusion." *Time, Inc. v.*

*Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999) (quoting 15 U.S.C. §

1114(1)(a)).  The owner of a valid registered trademark proves infringement with

evidence that another's "use of it is likely to cause confusion."  *Id.*; *see* 15 U.S.C. §

1057(b) ("A certificate of registration of a mark . . . shall be *prima facie* evidence

of the validity of the registered mark . . . .").  For likelihood of confusion, "courts

in the Second Circuit consider the factors articulated in *Polaroid Corp. v. Polarad*

*Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  *See Time*, 173 F.3d at 117.

The eight *Polaroid* factors are (1) the strength of the registered mark, (2) the

degree of similarity between the two marks, (3) the proximity of the parties' areas

of commerce, (4) the likelihood that the plaintiff will bridge the gap separating

their areas of activity, (5) actual consumer confusion, (6) whether the defendant

acted in bad faith or was otherwise reprehensible in adopting the mark, (7) the

quality of the defendant's product, and (8) the sophistication of the relevant

consumer group.  *See Polaroid* at 495.

    A claim of tortious interference with business relations requires proof that

(1) plaintiff had business relations with a third party; (2) defendant interfered with

those business relations; (3) defendant acted for a wrongful purpose or used

dishonest, unfair, or improper means; and (4) defendant's acts injured the

relationship.  *See Hurlbut Health Consulting v. Otis Elevator Co.*, No. 24-6562,

2026 WL 25349, at *1 (W.D.N.Y. Jan. 5, 2026) (citing *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015)).

### The Merits Overwhelmingly Favor Miramar, Not Rag & Bone

Rag & Bone's contention is specious that it is likely to succeed on the merits of either of its two claims.  To the contrary, it is likely that Miramar would succeed on its forthcoming claim of trademark infringement and its entitlement to a preliminary injunction to prevent ongoing irreparable harm, including consumer confusion.  Specifically, the eight *Polaroid* factors weigh strongly in favor of Rag & Bone's infringement of MBG's incontestable, registered MIRAMAR trademark registrations, just as the USPTO concluded.  Concerning the first factor—the strength of the registered mark—MBG's registrations for its MIRAMAR® trademarks are incontestable.  As such, the trademarks are presumed to represent, and do represent, strong trademark rights.

Concerning the second factor—the degree of similarity between the two marks—as the USPTO already has determined, Rag & Bone's use of MIRAMAR is very similar, including because it "creates a confusingly similar commercial impression because consumers are likely to believe that registrant's mark is a condensed form of applicant's mark or that registrant has begun offering similar goods and services under another iteration of its registered mark."  *See* Ex. H.

Concerning the third factor—the proximity of the parties' areas of commerce—as the USPTO already has determined, "The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered together in the marketplace by consumers.  Accordingly, consumers are likely to be confused and mistakenly believe that the products and services originate from a common source."  *See* Ex. H.

Concerning the fourth factor—the likelihood that the registrant will bridge the gap separating their areas of activity—the primary marketing channels for both parties are online channels including Google, Meta and Amazon, driving search results for MIRAMAR to the consumer's point of purchase.  As the Trademark Office explained, the parties' products "are likely to be encountered together in the marketplace by consumers."  *See* Ex. H.  Moreover, because MBG's primary business model is licensing its brands, including MIRAMAR®, MBG is inherently likely to expand its MIRAMAR® brand into other new markets.

Concerning the fifth factor—actual consumer confusion—several reasonable consumers and industry professionals already have been confused or have witnessed confusion due to Rag & Bone's extensive use of the MIRAMAR name which was mistakenly believed to be associated with MBG's longstanding and distinctive MIRAMAR® brand.  *See supra*.

Concerning the sixth factor—whether the infringer acted in bad faith or was otherwise reprehensible in adopting the mark—while intent is difficult to ascertain directly, the circumstantial evidence here allows for a strong inference of intent, including the fact that Rag & Bone has proceeded recklessly in adopting and using the name MIRAMAR in the face of not only MBG's conflicting trademark MIRAMAR® registrations, but the experts at the USPTO have specifically concluded there is a likelihood of confusion.

Concerning the seventh factor—the quality of the infringer's product—this factor appears to be neutral at best, because both parties produce and sell products of quality.  Concerning the eighth factor—the sophistication of the relevant consumer group—the parties' products are clothing primarily, which although not inexpensive, do not compel most consumers to exercise inordinate brand scrutiny to the extent needed to avoid a likelihood of confusion.

Therefore, the only likelihood of success favors MBG, not Rag & Bone, which means that this Court should consider a preliminary injunction only in MBG's favor—*i.e.*, enjoining any further infringement by Rag & Bone of MBG's registered, incontestable MIRAMAR trademarks.

Rag & Bone also is unlikely to succeed on its tortious interference claim because there is no reasonable evidence that MBG took any action "for a wrongful purpose or used dishonest, unfair, or improper means," as opposed to simply

"policing" an infringement of its registered, incontestable MIRAMAR trademarks. As any trademark owner does, MBG has an obligation to take such actions to stop infringement. *See Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, No. 06-3508, 2007 WL 2914452, at *3 (2d Cir. Oct. 5, 2007) (noting trademark owner's "duty to police its rights against infringers") (quoting 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31:38, at 31–97 (4th ed.2007)). Trademark enforcement constitutes privileged and justified conduct, not improper means, and therefore cannot support a tortious interference claim. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015).

### Only MBG Faces Irreparable Harm Or Hardship Absent An Injunction

Based on its likely success on the merits of proving trademark infringement by Rag & Bone, only MBG faces irreparable harm and a decidedly favorable balance of hardships. Under the Lanham Act, MBG is entitled to a rebuttable presumption of irreparable harm upon a showing of likelihood of success on the merits. *See* 15 U.S.C. § 1116(a). Even notwithstanding the presumption, MBG's loss of control over the MIRAMAR® mark's identity and goodwill, including the actual consumer confusion and marketplace displacement described hereinabove, is not readily quantifiable and constitutes irreparable harm. Because of Rag & Bone's much greater presence in the marketplace, MBG also has suffered and continues to suffer irreparable damage to customer relationships. See Ascher Decl.

¶¶ 25-28; Valero Decl. ¶ 12 ("Unless resolved, the continued public association between Rag & Bone and the MIRAMAR® brand will continue to interfere with MBG's licensing activities and impair the ability of brand representatives like myself to effectively market and license the MIRAMAR® brand."); Kusnetz Decl. ¶ 9 ("As a result of this confusion and uncertainty, and because Rag & Bone's market conduct created doubt regarding who truly controlled the MIRAMAR name in commerce and particularly in the clothing space, I determined that I could not proceed with the MBG transaction until the trademark issue was resolved. This resulted in a delay of a fully-executed term sheet and disruption to ongoing business planning and investment timelines.").

## Conclusion

The public interest always favors preliminary injunctive relief in favor of trademark owners when necessary to protect against consumer confusion in the marketplace. *See, e.g., 3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 406 (E.D.N.Y. 2021) ("The consuming public has a protectable interest in being free from confusion, deception and mistake.") (granting preliminary injunction for trademark owner). Because MBG is likely to succeed in proving trademark infringement and is suffering irreparable harm, this Court should find and conclude that it is MBG, not Rag & Bone, who is entitled to this Court's exercise of its

equitable powers in favor of a preliminary injunction to prevent any further

trademark infringement by Rag & Bone.


Dated:  January 20, 2026                    Respectfully submitted,

                                            /s/ Stephen M. Lobbin
                                            Stephen M. Lobbin (CA-SBN 181195)
                                            * admitted in SDNY
                                            sml@smlavvocati.com
                                            **SML Avvocati P.C.**
                                            4640 Cass Street #90142
                                            San Diego, California 92109
                                            Tel: 949.636.1391

                                            Attorneys for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 20, 2026, a true and correct copy of the above document was provided to all counsel of record through the Court's CM/ECF system.

/s/ Stephen M. Lobbin