**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Rag & Bone Holdings, LLC and RB
Topco Sagl,

    Plaintiffs,

        v.                                    Case No. 1:25-cv-09937-LGS

Miramar Brands Group, Inc.,

        Defendant.

_____


**Declaration of Stephen Y. Ascher, Jr. in Support of Defendant's Motion to**
**Dismiss and in Opposition to Plaintiff's Motion for Preliminary Injunction**


I, Stephen Y. Ascher, Jr., declare and state as follows:

1.    I am the principal of Defendant Miramar Brands Group, Inc.
("MBG"). I have personal knowledge of the facts stated herein, and if called to
testify as a witness, I could and would testify competently thereto.

2.    MBG is a fonder-led, privately-held California intellectual property
holding and brand-licensing company, with its only place of business in Southern
California and no offices, employees, retail locations, or targeted commercial
activities in this District or New York generally. MBG and its original core brands
King of the Beach®, King of the Court® and Sideout® were founded in 1983 by,
among others, me and renowned Olympian and World Champion Christopher St.

1

John "Sinjin" Smith.

3.    Since its original founding more than four decades ago, MBG has developed, owned and licensed a portfolio of registered trademarks and sports-entertainment formats globally, including the MIRAMAR® brand, KING OF THE BEACH®, KING OF THE COURT®, and related apparel, athleisure, lifestyle goods, and globally promoted sports and media events.

4.    MBG's official websites include miramarbrands.com, miramarstores.com, miramar.shop, miramarmarine.com, miramarofficial.com, miramardenim.com, kingofthebeach.com, kingofthecourt.com and queenofthesnow.com.  MBG's social media handles include @miramar, @miramarfilm, @kingofthebeachusa, @queenofthebeachusa and others.  MBG's foundational and longstanding brands include MIRAMAR®, SIDEOUT®, QUEEN & KING OF THE BEACH®, QUEEN & KING OF THE COURT® and QUEEN & KING OF THE SNOW® used in connection with apparel, sportswear, lifestyle goods, accessories and globally-promoted sports and media events (collectively the "Crown Brands").  Attached herewith as **Exhibit A** is a true and correct copy of selected pages from MBG's websites.

5.    MBG's core business is the licensing, management and protection of its intellectual property portfolio.  Over decades, MBG has provided brand management, licensing and consulting services in fashion, sports, and global retail

media networks to long-term partners including Hearst Corporation and Lagardère. MBG holds minority ownership or investment interests in certain heritage lifestyle brands, generating substantial revenues over many years.  MBG has licensed and created collaborations involving the ELLE® and ELLE Decor® brands and others.

6.    MBG's brands including MIRAMAR® are the primary trademarks used in connection with MBG's collaboration and sponsorships of the primary worldwide professional beach volleyball tours, called "Queen & King of the Beach®" and "Queen & King of the Court®" which cater to the 25-35 year old global consumer and athleisure sports enthusiasts.  The MIRAMAR® trademark appears extensively on signage and most clothing worn in connection with these amateur and professional beach volleyball events and tours and related activations, including ELLE-branded beach lifestyle integrations in collaboration with MBG.

7.    MBG has taken measured and consistent steps and actions to protect and police its global trademark rights, including preventing others from conflicting uses.  For example, based on MBG's longstanding use of its MIRAMAR® trademark alone and, at minimum, its U.S. trademark use and priority dating back to no later than 2009, MBG has been granted many trademark registrations including (a) incontestable U.S. Trademark Registration No. 3,891,117 ("the '117 Registration") for MIRAMAR (stylized), and (b) incontestable U.S. Trademark Registration No. 3,891,118 ("the '118 Registration") for MIRAMAR®.  Both of

these registrations were granted in 2010, and both are in International Class 25 for clothing, including "swimwear, tops, shirts, T-shirts, sweatshirts, tank tops, vests, blouses, coats, overcoats, suits, jackets, sports coats, sweaters, pullovers, jumpers, skirts, dresses, body suits, leotards, leggings, pants, trousers, sweatpants, shorts, gloves, socks, underwear, and belts; headwear, namely, caps, hats, and visors; footwear, namely, shoes and sandals, sleepwear, athletic uniforms, in Class 25." MBG has also been granted European Union Trademark Registration No. 015811541. Attached herewith as **Exhibits B-C** are true and correct copies of MBG's incontestable trademark registrations for its MIRAMAR® trademarks.

8.      MBG has a long and well-documented history of protecting its incontestable, registered trademarks through appropriate legal and administrative channels when necessary, including seeking court relief against substantially larger entities. For example, MBG previously enforced the SIDEOUT® trademarks in a widely-reported dispute against Nike's infringing "SIDE ONE" branding, a classic "David-versus-Goliath" matter that resulted in the cessation of Nike's infringing use. MBG has enforced its Crown Marks consistently for decades—prevailing against global apparel conglomerates, individual infringers, and junior registrants alike—while maintaining a restrained, injunctive-focused enforcement posture.

9.     MBG's measured approach to trademark enforcement was further confirmed in *Miramar Brands Group, Inc. v. Fonoimoana*, Case No. 16-cv-04224 (C.D. Cal.), a federal action involving Eric Fonoimoana and a junior party's attempted appropriation of MBG's Queen-format Crown Marks in connection with beach volleyball events.  There, MBG sought only injunctive relief to halt infringing use and expressly waived any claim for monetary damages, underscoring that MBG's objective was protection of brand integrity—not financial leverage.  During proceedings, this Court repeatedly rejected the junior party's reliance on later trademark registrations and rejected efforts to curtail MBG's senior rights, confirming that MBG lawfully owned and controlled the relevant Crown Marks and that the junior party's contrary position was untenable. The Court further recognized the inherent logical relationship among MBG's Crown Marks—acknowledging that Queen-formative marks naturally relate to and derive from MBG's senior King-formative marks—and dismissed belated attempts to inject abandonment or reverse-confusion theories.  MBG ultimately prevailed, confirming that its Crown Marks function as a unified family and that MBG enforces those rights in a consistent, restrained, and judicially approved manner.

10.     MBG's enforcement efforts have also extended to protecting its marks in connection with major media and real-estate developments, including requiring

changes to third-party branding in the feature film *Father of the Bride*.  MBG

resolved trademark issues involving Caruso Property Management through

proceedings before the United States Patent and Trademark Office including a

negotiated resolution permitting limited, differentiated uses.

11.    MBG's consistent history of measured enforcement underscores that

MBG's actions here are part of a longstanding practice of protecting its intellectual

property in an even-handed manner.

12.    MBG has licensed to, has minority interests in and/or has entered into

long-term partnership agreements involving the MIRAMAR® trademark with,

many companies including Spalding (a Berkshire Hathaway company), Fruit of the

Loom and its Russell Brands division, Vanity Fair brands and Union Underwear,

Lagardère and Hearst's ELLE and ELLE Decor brands, American Brand Holdings

and its Hang Ten® brand, Mikasa Corporation, Sportworx B.V. in The

Netherlands, the Fédération Internationale du Volleyball ("FIVB"), and The

Amateur Athletic Union of the United States ("AAU").  MBG also has pending

license, partnership, collaboration and/or other agreements, including with

Northaven Brand Holdings for sportswear and athleisure apparel, and Smack

Sportswear for activewear.  MBG's partnerships and brand value have been

adversely impacted by Rag & Bone's infringing use of MIRAMAR.

13.    MBG's clothing items are sold under long-term licenses online as well as retail outlets that include Amazon, TikTok, Meta, MBG's own websites and social media handles, major sporting goods and retail outlets, both online and brick-and-mortar.  MIRAMAR®-branded items include t-shirts, sweatshirts, hoodies, joggers, headwear, accessories, volleyballs, denim hats and jackets. MBG's products are typically priced at premium levels and cater to 25-35 year old athleisure and sports enthusiasts worldwide; for example, a sweatshirt for $88.50, sweatpants for $77.50, t-shirts for $32-60, a bomber jacket for $650, net systems for over $1,000 and premium, genuine leather beach volleyballs for over $99. Attached herewith as **Exhibit D** is a true and correct copy of exemplary pages showing MBG's products.

14.    On April 2, 2024, Rag & Bone executed an Intellectual Property Assignment Agreement unrelated to, and expressly excluding, any rights in or goodwill associated with the MIRAMAR name.  According to my knowledge, only as of about mid-2025 did Rag & Bone first start using MIRAMAR as a brand, without MBG's permission.  Only recently has Rag & Bone's brand use of MIRAMAR accelerated to such an extent that MBG started losing its visibility and brand association across major online platforms including Amazon, Google, eBay, Yahoo, Meta, TikTok and other digital search and commerce channels, for example

in search results for "MIRAMAR" and "MIRAMAR + CLOTHING."  The

confusion and resulting harm related to MIRAMAR-branded products and clothing

has accelerated in recent weeks, materially harming the value of MBG's

MIRAMAR® brand and others that it owns or controls.  There is representative

marketplace and search-result displacement evidence.  Attached herewith as

**Exhibits E-G** are true and correct copies of selected web pages showing Rag &

Bone's unauthorized use of MIRAMAR displacing MBG's use of its registered

MIRAMAR® brand.

15.    As the senior and incontestable owner of the MIRAMAR® brand and

trademarks, MBG is expressly entitled — and in many instances required — by

major digital commerce and social media platforms, including Amazon and Meta,

to participate in brand-registry programs designed to prevent U.S. and international

consumer confusion, counterfeiting, and trademark infringement.  These programs

operate through automated and semi-automated enforcement systems governed by

platform Terms of Service ("TOS") that prohibit unauthorized use of registered

marks.  MBG does not target individual sellers or employees of third-party

companies; rather, enforcement actions are initiated and processed pursuant to

platform trademark policies once infringing uses are detected.

16.    Rag & Bone's employees' subsequent complaints and demands that MBG "retract" enforcement actions — many of which MBG did not initiate or control — reflect the operation of platform-controlled brand-protection mechanisms and trademark law, not any misconduct by MBG.  Rag & Bone's rush to federal court to halt lawful enforcement thus represents an effort to weaponize judicial process to preserve and expand its infringing use of MBG's MIRAMAR® brand, rather than a legitimate response to any wrongful conduct by the senior mark owner.

17.    This action presents a classic case of reverse confusion, in which a powerful junior user has adopted and promoted a mark in a manner that overwhelms and displaces the identity of a senior California brand.  Rag & Bone is a New York-based fashion house that chose to use the MIRAMAR name recklessly, without clearing the name and without acquiring any rights to use MBG's already-existing brands.  As a result of Rag & Bone's extensive marketing and online "saturation" beginning in mid-2025, consumers increasingly associate the name MIRAMAR with Rag & Bone rather than with MBG, the owner of the brand.  Rag & Bone adopted MIRAMAR in 2025 as a collection and brand signifier to generate market momentum in core apparel categories, notwithstanding MBG's senior rights.

18.     On June 9, 2025 Rag & Bone filed U.S. Trademark Application Serial

No. 99224195 for the proposed trademark RAG & BONE / MIRAMAR.  Rag &

Bone acknowledged that it had not yet used MIRAMAR as an asserted trademark;

rather, it stated its "intent to use" the mark.  In this action Rag & Bone asserts use

of MIRAMAR as a brand "for at least the last 13 years," but it failed to assert any

such use in its trademark application, and MBG was not aware of any such use

until mid-2025.

19.     Recently on October 30, 2025, the U.S. Patent and Trademark Office

("USPTO") rejected the application via a "Section 2(d) Refusal—Likelihood of

Confusion" for many reasons, primarily based on MBG's '117 Registration and

'118 Registration.  Attached herewith as **Exhibit H** is a true and correct copy of

the October 30, 2026 Office Action.

20.     In the Office Action, the USPTO made findings and conclusions

including the following.  As the Office Action explained:

> Trademark Act Section 2(d) bars registration of an applied-for mark
> that is so similar to a registered mark that it is likely consumers would
> be confused, mistaken, or deceived as to the commercial source of the
> goods and/or services of the parties.  *See* 15 U.S.C. §1052(d).
> Likelihood of confusion is determined on a case-by-case basis by
> applying the factors set forth in *In re E. I. du Pont de Nemours & Co.*,
> 476 F.2d 1357, 1361, 177 USPQ 563, 567 (C.C.P.A. 1973) (called the
> "*du Pont* factors"). . . .  Although not all *du Pont* factors may be
> relevant, there are generally two key considerations in any likelihood

of confusion analysis: (1) the similarities between the compared marks and (2) the relatedness of the compared goods and/or services.

21.    Concerning the "Similarity of the Marks," the USPTO concluded: "In this case, both marks share the similar wording, MIRAMAR.  This similarity creates a confusingly similar commercial impression because consumers are likely to believe that registrant's mark is a condensed form of applicant's mark or that registrant has begun offering similar goods and services under another iteration of its registered mark.  Thus, the addition of wording does not create a distinct commercial impression that distinguishes applicant's mark from registrant's mark."

22.    Concerning the "Relatedness of the Goods and Services," the USPTO concluded: "The attached Internet evidence establishes that the same entity commonly manufactures, produces, or provides the relevant goods and/or services and markets the goods and/or services under the same mark.  Thus, applicant's and registrant's goods and/or services are considered related for likelihood of confusion purposes. . . .  The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered together in the marketplace by consumers.  Accordingly, consumers are likely to be confused and mistakenly believe that the products and services originate from a common source.  Therefore, registration must be refused."

23.     Rag & Bone has requested an extension of time to respond to the Office Action, but historically it is unlikely Rag & Bone would be able to overcome the USPTO's refusal to approve the application to register.  In the meantime, Rag & Bone has continued and expanded its MIRAMAR rollout notwithstanding MBG's August 28, 2025 cease-and-desist letter.  In this action, Rag & Bone has asserted many allegations, including that "Rag & Bone at no time has committed trademark infringement [because] there is no reasonable argument that confusion is even likely."  Rag & Bone did not address the USPTO's October 30, 2025 findings regarding likelihood of confusion, however, because no defense to those findings is plausible.

24.     The Rag & Bone MIRAMAR product line "includes among other things, pants, shorts, shirts, dresses, and T-shirts," as admitted in this action. Beginning in 2025, Rag & Bone expanded promotion of its infringing MIRAMAR line that has become popular with consumers, to the point that searches for "MIRAMAR clothing" prominently display Rag & Bone's MIRAMAR products in sponsored and paid search results ahead of MBG's products and official websites. Rag & Bone's clothing items are sold online as well as in retail outlets including Amazon, Google, T.J. Maxx, and other places in competition with MBG's clothing items.  Rag & Bone's items are typically priced at premium levels; for example,

sweatpants priced approximately $100-$200.  Attached herewith as **Exhibit I** is a true and correct copy of selected web pages showing Rag & Bone's competitive products.

25.    Already there have been several examples of actual confusion.  For example, several individuals including Mr. Theodore Jaffrey, Mr. Moses Khuu and Mr. Dale Waters have contacted MBG and asked about Rag & Bone's use of MBG's MIRAMAR brand.  Attached herewith as **Exhibit J** are true and correct copies of these communications.

26.    Rag & Bone's infringing use of MIRAMAR® and its ensuing efforts to mischaracterize lawful brand-registry enforcement have also caused reputational harm to MBG's long-standing commercial relationships.  For example, a senior executive of Nordstrom — a retail partner with whom MBG has maintained a trusted relationship for decades — contacted MBG directly to question why infringement issues had arisen at all, reflecting confusion and concern generated by Rag & Bone's conduct rather than any change in MBG's even-handed enforcement practices.  At the same time, searches for "Miramar" on major retail platforms, including Nordstrom.com and other retail partners, continued to surface Rag & Bone's MIRAMAR-branded products notwithstanding MBG's proper enforcement efforts.  This distortion of marketplace signals and strain on established business relationships constitutes irreparable harm to MBG's goodwill and reputation that

cannot be remedied by monetary damages alone. Through its reckless adoption and saturation use of MIRAMAR, Rag & Bone has collapsed the integrity of MBG's long-standing brand relationships, including relationships that had remained stable and uncontested for decades prior to Rag & Bone's infringement.

27.    Rag & Bone's infringing use of MIRAMAR has been amplified in reputable fashion and mainstream consumer press within the Hearst publishing ecosystem. ELLE Magazine published a Black Friday feature highlighting Rag & Bone's "Miramar" sweatpant jeans collection as a shopping pick, without reference to MBG's senior and incontestable MIRAMAR® brand. This misattribution is particularly injurious because ELLE Magazine is owned by Hearst, a long-standing editorial and commercial partner within MBG's brand-and-licensing ecosystem. Even more striking, in a nationally distributed issue of Oprah's Daily—a Hearst publication—Rag & Bone's "MIRAMAR" jeans were selected and featured as an editorial shopping "pick," again without reference to MBG's senior MIRAMAR® brand. These unpaid editorial placements underscore the immediacy and severity of the reverse-confusion harm: Rag & Bone's junior use is being amplified by reputable third parties, causing consumers to associate MIRAMAR with Rag & Bone rather than with MBG. These examples further reflect marketplace exposure to Rag & Bone's MIRAMAR branding through trade-press and retail-media coverage and related marketplace displacement evidence.

28. Based on the foregoing, MBG is the senior owner of its incontestable, registered MIRAMAR® trademarks, having used the marks continuously for decades in connection with its California lifestyle apparel, sports, and global brand extensions. Rag & Bone, a national fashion retailer and marketer, knowingly and recklessly adopted MIRAMAR as a collection name and brand signifier in 2025. By saturating the market through national retail distribution, paid digital advertising, influencer campaigns, and algorithm-driven promotions, Rag & Bone has caused consumers to believe—incorrectly—that MBG's senior brand MIRAMAR® is affiliated with, derived from, or subordinate to Rag & Bone. The harm to MBG is already occurring and is accelerating, as confirmed by platform-level confusion across Amazon, Meta and Google, including search-engine displacement that has effectively erased MBG's MIRAMAR® brand identity online.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and if called to testify, I could and would competently do so.

Executed on this 20th day of January 2026 at Pasadena, California.



## CERTIFICATE OF SERVICE

I hereby certify that, on January 20, 2026, a true and correct copy of the above document was provided to all counsel of record through the Court's CM/ECF system.

/s/ Stephen M. Lobbin