**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Rag & Bone Holdings, LLC and RB Topco Sagl,

Plaintiffs,

v.

Miramar Brands Group, Inc.,

Defendant.

Case No. 1:25-cv-09937-LGS

-----------------------------------------------

Miramar Brands Group, Inc.,

Counterclaimant,

v.

Rag & Bone Holdings, LLC, Guess?, Inc., WHP Global, LLC, Bloomingdale's, LLC, Nordstrom, Inc., Evereve, Inc., Revolve Group, Inc., URBN US Retail, LLC, BOP LLC, Rue Gilt Group, Inc. and Couponology, Inc.,

Counterdefendants.

---

**Declaration Of Dr. Alexandra Reed Lajoux, Ph.D., M.B.A.**

**In Support Of Motion For Preliminary Injunction**

I, Dr. Alexandra (Alex) Reed Lajoux, Ph.D., M.B.A., declare and state as follows:

1. I am a financial/economic expert and founding principal of Capital Expert Services, LLC. Except as to those matters stated on information and belief, I have personal knowledge of the facts stated herein, and if called to testify as a witness, I could and would testify competently thereto.

2. I have worked as a financial/economic expert for over a decade. I founded Capital Expert Services, LLC in 2016. From 2005-2016, I served as Chief Knowledge Officer for the National Association of Corporate Directors. My various prior positions included Editor-in-Chief, HR Director with Arthur Andersen & Co. I have expertise in not only financial capital but also human and intellectual capital. My articles have appeared in *Financier Worldwide*, *Risk & Compliance* and *Capital Insights*, and my works are cited in more than 950 academic studies (according to academia.edu). My degrees include a Ph.D. in Comparative Literature from Princeton University, an M.B.A. from Loyola University (Maryland), and a B.A. from Bennington College. Attached herewith as **Exhibit 1** is a complete statement of my professional background and qualifications.

3. I was engaged in this action to provide an expert analysis of the issue of irreparable harm; that is, whether and to what extent the harm being suffered by Plaintiff Miramar Brands Group, Inc. ("MBG") and being caused by infringement of its asserted MIRAMAR® trademark by Defendant Rag & Bone Holdings, LLC ("Rag & Bone") and the other Defendants (which fact I assume for purposes of the analysis) is irreparable harm, rather than harm fully compensable by monetary damages.

4. This Declaration contains (a) a complete statement of all my opinions at this stage of this action, and the reasons for them, (b) the facts or data I considered in forming them, (c) any exhibits that will be used to summarize or support them (attached herewith), (d) my qualifications, including a list of all

publications authored in the previous 10 years (*see supra* and Exhibit 1), (e) a list of all other cases in which, during the previous 4 years, I testified as an expert at trial or by deposition (*see* Exhibit 1), and (f) a statement of the compensation to be paid for the study and testimony in the case, which is $750/hour.

5. My analysis of irreparable harm being suffered by MBG began with extensive communications and discussions with MBG and its counsel, including my review of the Amended Complaint, which provides a comprehensive summary (including exhibits) describing in detail the factual background of this action, including MBG's trademark rights in and to the MIRAMAR® brand used in connection with apparel and other lifestyle products and services, as well as related licensing and brand management services. I have also reviewed other documents filed in this action and in the related action in New York.

6. In mid-2025, Defendant Rag & Bone and the other Defendants began a widespread, nationwide campaign of advertising, marketing and selling apparel and related lifestyle products under the MIRAMAR brand name. The sudden and bold nature of this MIRAMAR-branded campaign caught MBG by surprise and was a very unusual development because MBG's MIRAMAR® brand has been in continuous commercial use for decades and under normal circumstances, a junior user of an identical name does not tend to use a brand for which ownership is clearly established and infringement is plain, as in the case for MBG's MIRAMAR® brand. Before mid-2025, MBG had not been aware of any prior use of the MIRAMAR name by Rag & Bone or any other Defendant as a brand name.

7. As part of Rag & Bone's new campaign, in June 2025 it filed an application to register its proposed MIRAMAR trademark, but the application was rejected by the U.S. Patent & Trademark Office ("USPTO") based on the longstanding senior rights of MBG. As the USPTO stated in part: "The marks create the same commercial impression and the attached evidence illustrates that the goods and services are commercially related and are likely to be encountered

together in the marketplace by consumers. Accordingly, consumers are likely to be confused and mistakenly believe that the products and services originate from a common source. Therefore, registration must be refused."

8. Irreparable harm related to trademark rights begins with the recognition that trademark infringement may not only harm the *earnings* stream of the registrant and owner of the brand, but it can also deplete the *asset value* of the brand itself in a way that cannot be repaired. Irreparable is often the harm done to the *reputation of the owner* of the trademark, especially if that owner is in the brand management businesses, which is the case for MBG. Furthermore, because the importance of a registered trademark in the marketplace is having the exclusive right to use a brand which has become distinctive of the registrant's business to the relevant consuming public, the analysis of irreparable harm includes the recognition that trademark infringement harms the *relevant consuming public* by way of confusion. Confusion among the relevant consuming public diminishes the distinctiveness the trademark rights are meant to protect as exclusive, to the benefit of not only the registrant but also to the benefit of the relevant consuming public, who deserve protection under the law from being confused as to the distinctive source of goods and services. Seen through the lens of behavioral economics, consumer confusion can lead to consumer migration away from the trademark holder, which movement by definition means lower market share for the trademark owner and, absent an increase in licensing fees and/or reduction in licensing costs, a drop in earnings.

9. Types of irreparable harm include "loss of business reputation, customers, market position, confusion of potential customers, and goodwill," as this Court summarized in *Sugarfina, Inc. v. Sweitzer LLC*, 2018 WL 6265074, at *8 (C.D. Cal. Mar. 8, 2018). If a trademark owner demonstrates that any such harm is likely to occur in the future, the harm should be deemed irreparable. In one recent case, the court found harm to be irreparable supporting injunctive relief, even when no harm had yet occurred. The court credited plaintiff's testimony demonstrating

"an existential threat to its continued operation and existence," and that "[a] money judgment after the fact will not make Capconvert whole if it loses customers to Signyl." *Capconvert, LLC v. Brown*, No. 26-2149, 2026 WL 1471880, at *10 (N.D. Cal. May 26, 2026) ("[A] threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.") (citing *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)).

10. In this case, MBG asserts that it already is suffering irreparable harm, and that it would continue suffering irreparable harm without a preliminary injunction from this Court. Based on the following economic analysis, I agree. Just as a scandal can ruin the reputation of an upstanding citizen, so the misuse of a brand can deprive its owner of the brand's highest and best value forever, particularly given the nature of the Internet and the often long duration of posted material.

11. The harm from the infringing actions of Rag & Bone can be seen both with respect to a short-term impact on income, and a long-term impact on the MIRAMAR® brand asset itself. While the short-term harm may be remediable in part, the long-term harm is irreparable. A brand is more than a word. It is an evolving constellation of values, associations, experiences, and consumer expectations developed through long-term use by the brand owner MBG.

12. The ISO 10668 Standard defines a brand as a "marketing-related intangible asset including, but not limited to, names, terms, signs, symbols, logos and designs, or a combination of these, intended to identify goods, services or entities, or a combination of these, creating distinctive images and associations in the minds of stakeholders, thereby generating economic benefits/values." The ISO 20671 Standard (for broader, holistic brand evaluation) states: "Brands have value to both the entities that have rights to the brand and to stakeholders [such as the relevant consuming public] who value the functional/emotional/social benefits and

experiences they associate with the brand." Trademark law protects not only against direct consumer confusion, but also against the destruction of the commercial identity and goodwill that give a brand its economic value.

13. The concept of "brand heritage" explains how brands acquire value over time through consistent associations, narrative continuity, consumer trust, and cultural meaning. When an infringing user adopts a senior brand, harm may occur on multiple levels. First, to the extent the infringer mimics the senior brand's identity, consumers may become confused regarding sponsorship, affiliation, licensing, or ownership, thereby diverting licensing value and commercial opportunities from the senior owner. Second, and more damaging, an infringer may alter or overwrite the established identity of the brand itself. When a junior user deploys a senior brand in ways that depart materially from the brand's longstanding heritage, positioning, and consumer associations, the infringer reshapes public perception of the brand and erodes the integrity of the goodwill accumulated by the senior owner over decades. That harm is particularly acute in reverse-confusion cases involving commercially dominant junior users with the power to saturate digital marketplaces, media channels, search results, and algorithmic commerce systems. A brand that took decades to build could be destroyed in a matter of months.

14. Here, MBG spent decades cultivating MIRAMAR® as an "American Riviera" lifestyle and heritage sports brand associated with beach culture, volleyball, premium California living, luxury-athleisure, and global coastal events. Rag & Bone and the other Defendants have shown no sensitivity toward the intrinsic meaning of this decades-old lifestyle brand, referring to MBG as a "narrow surf-and-beachwear" shop while at the same time moving away from its oceanic roots by repositioning MIRAMAR as a "sweatpant jeans" and comfort-fashion brand through massive national advertising campaigns, "This Is Not Denim" marketing, and track-pant and fleece collections.

15. At the same, confusingly with its new MIRAMAR branding, Rag & Bone has caused MIRAMAR co-branded swimwear and apparel saturation including across Amazon, Meta, Google, Shopbop, and national retail media. The resulting injury extends far beyond diverted sales. It includes most harmfully MBG's loss of control over its own identity, heritage, and the true meaning of the MIRAMAR® brand itself. Moreover, because MBG derives part of its income as a brand manager, the irreparable harm done to the MIRAMAR® brand also has caused irreparable harm to the reputation of MBG, including loss of deal flow and new licensing opportunities.

16. The reverse confusion harm is magnified because MBG's trademarks are not a single brand but rather an interlocking ecosystem. For four decades, MBG's Crown Marks in association with MIRAMAR® have been used together at the intersection of sport, fashion, and culture. The resulting harm extends throughout the MBG ecosystem and negatively affects MBG's ability to license and promote the system as a whole, including an upcoming documentary film chronicling the careers of athletes long associated with these marks.

17. The direct economic impact of the infringement and related destruction of the MIRAMAR® brand heritage can be calculated under several different categories and subcategories, each of which can be considered an independent variable. The methods applied herein are consistent with the AICPA/CIMA Statement on Standards for Valuation Services (VS Section 100).

18. Concerning the recent impact on income, MBG faces reduced income from licensing the MIRAMAR® brand, as well as reduced income from brand consulting due to the perceived "mess" surrounding the MIRAMAR® brand deterioration. While overall total royalty revenues did not decline in 2025 and 2026, the percentage of royalty revenues related to the MIRAMAR® brand did decline, according to internal estimates I have reviewed. MBG's MIRAMAR® sales on Amazon are down almost 50% based on initial projections compared to last year.

Furthermore, the profitability of licensing is eroding as MBG is now having not only to compete in its own “athleisure” market for the MIRAMAR® brand, but MBG is now forced to spend money on its own MIRAMAR® keyword to avoid disappearing during the critical summer season, as Rag & Bone is using AI to saturate the Internet with its infringing MIRAMAR brand.

19. Concerning the future impact on income, MBG faces a present value of the difference between (a) what MBG would have earned in 2025-2030 had the 2025 infringement and related confusion not occurred, versus (b) what MBG is likely to earn in 2025-2030 given the infringement and resulting confusion. I estimate that amount to be $640,334 as a conservative floor. This analysis is based on the historical record of royalty revenue in times of high growth, versus times of flat growth, versus times of decline, shown as compound annual growth rate (CAGR).[1] The record shows that a five-year period of growth (2008 to 2012), the CAGR for MBG royalty income was +12.85%. In a five-year period of slow growth (2013 to 2017) the CAGR was +4.89%. Finally, in a five-year periods of decline (2018 to 2022) the CAGR was -4.69%, and updating to the most recent five year period (2021-2025) the decline was -3.92%. For 2025, the estimated royalty revenue will be $633,000. Looking forward five years, here are the possible CAGR scenarios (high, medium, low using the least negative value to be conservative): High CAGR growth = $1,158,541, slow CAGR growth = $804,214, negative CAGR growth = $518,207. The difference between a high growth scenario versus the negative growth scenario that now seems likely is $640,334. This is a conservative future that does not capture the harm to MBG; it only reflects a loss to one of its income streams.

20. Concerning the long-term impact on brand exit value, MBG faces a present value of the difference between (a) what MBG could sell the MIRAMAR®

[1] The formula is CAGR = ((BV/EV) to the 1/n −1) × 100, where EV = Ending Value, BV = Beginning Value, and n = Number of Years.

brand for 5 to 10 years from now had brand infringement and confusion not occurred, versus (b) what MBG likely could sell the MIRAMAR® brand for in 5 to 10 years given the infringement and resulting confusion. From the historical record we know that a “master license” for the MIRAMAR® brand and brand management was sold by its original owner Stephen Ascher to MBG for $1 million in December 2010. Assuming this sale was based on an arm’s length value, and assuming a modest CAGR of 4.6% (the average of historic high, medium, and low growth rates from that year to present), we can assume that could be worth $2,008,313 today, 15.5 years later.[2] Looking forward starting with a value of $2,008,313 using the same CAGR of 4.6%, we see a 5-year future exit value of $2,514,721 and a 10-year future value of $3,148,823. The present value of the 5-year exit amount at a 3% discount rate is $2,169,220 and the present value of the 10-year amount is $2,343,020. This value is entirely reasonable for company activity (royalty income) that has generated more than $20 million in revenues over the past 20 years for an average of $1 million per year. A common ratio used to buy privately owned companies is 2x revenues which, using the 20-year average, would be $2 million.

21. As an independent, market-based “cross-check” on the income-based values set forth hereinabove, I also considered multiples at which brand-management and licensing transaction methods are recognized under VS Section 100. Because licensing revenue is recurring, high-margin, and contractually supported by guaranteed minimum royalties, such enterprises are valued at high multiples of their licensing (royalty) revenue. For example, Authentic Brands Group, a private company currently planning an initial public offering[3] as the second-largest licensor in this sector, has been reported at a valuation of

---

[2] The formula is EV = BV times $(1 + r)^n$ where EV = Ending Value, BV = Beginning Value, r = Growth Rate and n = Number of Years.

[3] https://www.cnbc.com/2026/05/20/reebok-owner-authentic-brands-group-inches-closer-to-ipo.html

approximately $20 billion[4] annual licensing revenue of roughly $1.2 to $1.5 billion, on the order of *13 to 17 times revenue*. Applying a similar high (17x) multiple to the lost licensing revenue stream of $640,334 and the $1 million carrying asset value would give us a damage range of $10.9 million to $17 million—values well above the approximately $2 million conservatively estimated here as a floor.

22. Compare these values to a possible scenario of harm that could ensue because of brand confusion. The $2 million brand that should be worth between at least $2.5 and $3.1 million in the future (present value $2.2 million to $2.3 million) could *lose* rather than gain value. If there is severe brand confusion, this loss is likely to be sudden and steep. The value of the MIRAMAR® brand and the related reputation of MBG could dip below the carrying value of $1 million (recorded on the balance sheet) to be even lower, constituting an event of brand impairment, triggering a write-off. Under "Impairment of indefinite-lived intangible assets," Price Waterhouse Coopers discusses ASC 350-30 regarding asset impairment, which "allows an entity to first assess qualitative factors to determine whether events and circumstances indicate that it is more likely than not (that is, a likelihood of more than 50%) that an indefinite-lived intangible asset is impaired (*i.e.*, the asset's carrying amount exceeds its fair value)."

23. Using the test for impairment, it is my opinion that the market value of the MIRAMAR® brand, if the Rag & Bone infringement takes hold on the Internet and in the niche brand marketplace, would now be *less* than its carrying cost of $1 million, because it will have lost its cachet as an economic engine. To be conservative however, we will say that the brand is worth only $1 million now following the 2025 harm. With CAGR of 4.6% for 5 years ($1,252,156) and 10 years ($1,567,89), and a present value at a 3% discount, the exit values stand at $1,080,121 and $1,166,661. Subtracting $1,080,121 from $2,169,220 we derive a

---

[4] The $20 billion figure is widely cited and appears in the profile of its CEO and President Matt Maddox: https://www.nsgi.info/matt-maddox.

low end of brand exit value damage of at least $1,089,099. Subtracting $1,166,661 from $2,343,020 gives is a high exit value loss of $1,176,359. The conclusion is that exit value loss is between $1,089,099 and $1,176,359.

24. I note that because the $1 million sale in 2010 was a "master license" that included the brand value of MIRAMAR® not only as a brand but also as a brand management concept, the exit value loss calculated above for MIRAMAR® and MIRAMAR®-related brand licensing can stand as a proxy for harm to MBG. To avoid double counting, we will not offer a separate value for MBG. However, it should be noted that by definition, the harm to MBG will be greater than the harm to the MIRAMAR® brand and related licensing.

25. Based on the foregoing, in my opinion MBG already has suffered irreparable harm, and faces further poignant, irreparable harm without a prompt preliminary injunction, including but not limited to a drop in income from MIRAMAR® licensing activity as well as irreparable losses of (a) prospective customers and licensees for the MIRAMAR® brand, (b) goodwill connected to the established MIRAMAR® brand, (c) market share, (d) reputational harm, (e) diminished online presence, and ultimately (f) the existential threat of having its MIRAMAR® brand completely eviscerated and "swallowed" entirely by Rag & Bone's dominant and widespread infringing use of its new MIRAMAR brand.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and if called to testify, I could and would competently do so.

Executed on this 8th day of June 2026 at Fernandina Beach, Florida.

Alexandra Hajoux