Katten

50 Rockefeller Plaza
New York, NY 10020-1605
+1.212.940.8800 tel
katten.com

MARK T. CIANI
mark.ciani@katten.com
+1.212.940.6509 direct

October 19, 2026

**FILED UNDER SEAL/VIA ECF (REDACTED)**

Hon. Lorna G. Schofield
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

**Re: *Rag & Bone Holdings, LLC, et al. v. Miramar Brands Group, Inc.*, No. 1:25-cv-09937**
**Supplemental Letter Re: Pre-Motion Request for Sanctions**

Dear Judge Schofield:

Pursuant to Rule III.A.1 of Your Honor's Individual Rules and Procedures for Civil Cases, we write on behalf of plaintiffs Rag & Bone Holdings, LLC and RB Topco Sagl ("Plaintiffs") in further support of Plaintiffs' request for sanctions against defendant Miramar Brands Group, Inc. ("MBG") (*see* ECF No. 98[1]). When Plaintiffs first raised MBG's bad faith in April, they had only a partial view of its conduct. MBG's most recent production—a "dump" of approximately 1.6 million documents, including attorney-client communications for which the Court found the privilege had been waived—makes it clear that MBG's conduct in this matter is far more problematic. While Plaintiffs' review of MBG's recent production is still ongoing, it is already evident that this lawsuit was built on manufactured evidence, supported by false testimony, and pursued with open disregard for this Court's orders and the integrity of the judicial process. MBG's misconduct falls into five independent categories. Each one warrants severe sanctions on its own. Together, they make a fair adjudication of this dispute impossible.

*First*, MBG fabricated evidence on the central issue in this case. Even before MBG sent its first cease-and-desist letter, its principal, Stephen Ascher, stated that he intended to "finish[]" Rag & Bone. He then positioned MBG for litigation: he reshaped MBG's products and advertising to look more like Rag & Bone's; he moved into advertising channels where Rag & Bone already appeared; and he asked friends and business acquaintances, some with scripted language, to send

1 By Pre-Motion Letter dated April 6, 2026, Plaintiffs requested sanctions based on, among other things, evidence showing MBG's bad faith efforts to manufacture evidence and cover up those efforts. At that time, and based on the conduct set out in that Letter, Plaintiffs requested that the Court impose sanctions in the form of an adverse inference that MBG has suffered no loss of business opportunities as a result of Plaintiffs' use of the term "Miramar." The actions at issue and the sanctions requested here go beyond those back in April.

him messages "expressing" consumer confusion. MBG then submitted those messages to this Court through sworn declarations, and it continues to rely on them in its verified Counterclaims.

*Second*, MBG's witnesses, Mr. Ascher above all, have repeatedly given false testimony—at deposition and on the stand at the preliminary injunction hearing.

*Third*, MBG failed to preserve, and apparently destroyed, evidence that would undoubtedly be probative of the merits and MBG's bad faith. Mr. Ascher's phone has no call records before November 24, 2025, thousands of text messages are missing, and a forensic evaluation of the phone concluded that messages were *intentionally deleted* prior to production. Mr. Ascher also asked ChatGPT how to destroy documents at the height of this dispute.

*Fourth*, MBG and its counsel have shown contempt for this Court's orders, violating the Protective Order in this case and casually discussing the prospect of violating the Temporary Restraining Order to obtain leverage in the litigation.

[redacted]

MBG's conduct is not an isolated lapse or a mere discovery dispute. It is a deliberate, continuing pattern of bad faith that has corrupted both the documentary and testimonial record. When a party lies to the Court and its adversary "intentionally, repeatedly, and about issues that are central to the truth-finding process," it forfeits its right to have its claims decided on the merits. *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002). Accordingly, Plaintiffs respectfully request: (i) entry of a default judgment against MBG in Plaintiffs' favor; (ii) dismissal with prejudice of MBG's Counterclaims; and (iii) an award of the attorneys' fees and costs Plaintiffs have incurred because of MBG's misconduct.

MBG's misconduct justifying such sanctions is set out more fully below.[2]

* * * * *

**<u>Fabrication of Evidence</u>**

MBG fabricated evidence concerning issues at the heart of this case, submitted the fabricated evidence to this Court, and continues to rely on that evidence to support its claims of trademark infringement.

---

[2] Plaintiffs request permission to file this oversized letter and exhibits due to the importance of the relief requested and sheer volume of MBG's bad faith actions. Even at its oversized length, this letter brief describes only a portion of MBG's sanctionable conduct. Plaintiffs are submitting herewith appendices and exhibits that provide additional detail.

Before MBG even sent its first cease-and-desist letter to Rag & Bone, its principal, Stephen Ascher, made clear his intention to falsify evidence in an effort to "finish[]" Rag & Bone. (Exhibit 1 at 10.)[3] To further that scheme, Mr. Ascher fabricated evidence central to MBG's claim that Plaintiffs' use of "Miramar" infringes MBG's trademark, *i.e.*, that Plaintiffs' use is likely to cause consumer confusion. For example, Mr. Ascher made modifications to MBG's product offerings and promotion to align his business more closely to Rag & Bone. He likewise purchased the domain "MiramarDenim.com" for that purpose. (*Id.*) And he provided links to Rag & Bone's product offerings to a manufacturer in order to make apparel closer in kind to Rag & Bone apparel. (*Id.* at 21-23, 25-29.) Items intended to suggest competitive product offerings began proliferating on MBG's website both before and, at an increasing rate, shortly after Plaintiffs filed suit. (*See* ECF No. 68 ¶8.) Indeed, MBG continues to rely heavily on its (litigation-motivated) denim collection to show its overlapping offerings with Rag & Bone. (ECF No. 144 ¶34; ECF No. 144-1 at 33-34.)

After sending the initial cease-and-desist demand, MBG also began—for the first time—offering its products in advertising channels where Plaintiffs' products appeared, so as to better position its case for trademark infringement. On October 19, 2025, Mr. Ascher's wife observed that Rag & Bone's "clothes come up" when searching on Google for "Miramar," and then suggested that Mr. Ascher "should put the balls up so you can say the[y] come up first." (Exhibit 1 at 37.) This scheming goes to the heart of MBG's theory of harm: its purported market displacement theory is predicated on Rag & Bone's placement in search results, when MBG apparently was not even aware of its products' Google search placement before this dispute arose.

Even more notable are Mr. Ascher's now-undeniable attempts to manufacture what MBG has characterized as consumer confusion evidence. Consistent with Mr. Ascher's pattern of conduct described in Plaintiffs' April 6 letter—one of covertly requesting that his friends and business acquaintances manufacture evidence of lost deals (*see* ECF No. 98)—Mr. Ascher also engaged in a campaign to manufacture false evidence of consumer confusion using friends and acquaintances to bolster his claims against Plaintiffs. Documents recently produced show that at or around the time that MBG's counsel (Polsinelli) sent MBG's initial cease-and-desist demand during the fall of 2025, Mr. Ascher made *explicit requests* of various individuals—a number of whom have submitted declarations or have been named as "confusion witnesses" in filings in this case—to provide at times scripted statements falsely expressing confusion. (*See, e.g.,* Exhibit 1 at 40 ("It would be really good for you to send me text back from our group with Sinjin asking 'wow, can we get your Miramar Rag & Bone involved with QzkOtC as official Sportswe[a]r?'"); *id.* at 42-44 ("Can I tell Polsinelli you are pressing me as to who really owns Miramar after seeing my photo…?"); *id.* at 52 ("They [Polsinelli] are looking for evidence of actual confusion now…so if Wendy has a friend that can send a text asking where to return her[] Miramar denim shirt, it would help…").)

---

[3] Page numbers included in citations refer to the ECF page number of the Exhibit as filed.

MBG has repeatedly relied throughout this case on evidence generated as a result of Mr. Ascher's efforts to procure and/or present false accounts of confusion. By way of example, MBG submitted to the Court a declaration from Dale Waters in which he testified that he first encountered Rag & Bone's advertisement of the Miramar Collection organically in September 2025 and believed that MBG sponsored or was affiliated with it. (ECF No. 54-18 ¶¶ 4-10.) MBG similarly includes in its Counterclaims a text in which Mr. Waters states on September 15, 2025, "I just saw on the RAG & BONE Website (I think) a collaboration between RAG & BONE and your MIRAMAR brand." (ECF No. 144-30 at 4.) MBG's recent document production, however, revealed that these facts were not accurately presented. Indeed, *a month earlier*, on August 12, 2025, Mr. Ascher sent Mr. Waters a number of images of the Rag & Bone Miramar Collection and made clear to him that Rag & Bone's use was not authorized by MBG; Mr. Waters at the time made clear he was not confused and understood that there was no relationship between MBG and Rag & Bone. (Exhibit 1 at 54-56.) On August 25—again, well in advance of the purported incident of confusion that MBG submitted to the Court—Mr. Ascher sent Mr. Waters additional images of the Miramar Collection as well as a copy of an agreement with Caruso Property Management pertaining to an earlier trademark dispute. (*Id*. at 57-62.) Accordingly, Mr. Ascher—who verified the Counterclaims—knows that the September 15 text was not an actual expression of confusion and that Mr. Waters' testimony to the contrary was and is false.

MBG has submitted and relied upon "confusion declarations" and communications from other individuals who appear to have provided false testimony based on fabricated evidence. For example, in its Counterclaims, MBG offers as evidence of confusion an October text from Moses Khuu—another MBG declarant—in which Mr. Khuu asks Mr. Ascher where he should return Rag & Bone shorts. (ECF No. 144-30 at 2.) But Mr. Ascher informed Mr. Khuu that Rag & Bone's use of "Miramar" was an allegedly infringing use unconnected to MBG weeks earlier. (Exhibit 1 at 64-65.) Mr. Khuu's October text makes no sense because he knew when he sent it that Mr. Ascher was not affiliated with Rag & Bone. This is again clear evidence that Mr. Khuu's October text is a fabrication and not a real expression of confusion.

Similarly, MBG relies on a text sent by declarant Theodore Jaffrey on October 16, 2025, as evidence of consumer confusion. (ECF No. 144-30 at 3.) But Mr. Jaffrey's text asking how long the "Miramar activation" is up in the city came weeks after Mr. Ascher informed Mr. Jaffrey's *father*—a close friend and advisor of Mr. Ascher (Exhibit 1 at 79 (197:20-23), 80-82 (203:15-205:9))—that Rag & Bone was using "Miramar" and that MBG was in a dispute with Rag & Bone. (*Id*. at 90-91.) The elder Mr. Jaffrey advised Mr. Ascher to "[s]end them [Rag & Bone] an offer they can't refuse."[4] (*Id*. at 91.) Then, months after the younger Mr. Jaffrey sent his October text, and on the day of the hearing for Plaintiffs' temporary restraining order application, Mr. Ascher

4 On August 18, 2025, Mr. Ascher also asked the elder Mr. Jaffrey for his help on the "next project" and added that "you will understand where this will go for rag and bone." (Exhibit 1 at 97.) Mr. Jaffrey responded, "[a]lways happy to help u." (*Id.*)

*thanked* the younger Mr. Jaffrey for his October text. (*Id*. at 93-94.) Mr. Ascher's expression of gratitude is consistent with Mr. Jaffrey's text being a fabricated expression of confusion.

Yet another declarant who submitted testimony on behalf of MBG plainly manufactured evidence at Mr. Ascher's direction. Susan Valero wrote an email expressing her confusion about Rag & Bone's use of the word "Miramar" two weeks *after* she reviewed Mr. Ascher's cease-and-desist letter to Rag & Bone, and advised on strategies to obtain a license with WHP (a part-owner of Rag & Bone's intellectual property). (*See* Exhibit 1 at 100, 103-05.) In fact, Mr. Ascher and Ms. Valero apparently had a phone call a half hour before Ms. Valero sent her email, and Mr. Ascher sent Ms. Valero an AI-generated strategy summarizing MBG's dispute with Rag & Bone less than 20 minutes before she sent the email. (*Id*. at 107-09.)[5] Ms. Valero's prior knowledge of MBG's dispute with Rag & Bone, coupled with her willingness to strategize with Mr. Ascher about obtaining a license with WHP, provides clear proof that Ms. Valero's email expressing confusion was fabricated and designed to assist Mr. Ascher in his dispute with Rag & Bone.

Each of these MBG declarants (along with Mr. Kusnetz, whose testimony Plaintiffs previously addressed (ECF No. 98)) submitted testimony to this Court in connection with Plaintiffs' preliminary injunction motion. MBG continues to rely on this evidence, knowing that their testimony is false and misleading.[6]

**<u>MBG Witnesses' False or Misleading Testimony</u>**

MBG's misconduct has severely handicapped the ability of Plaintiffs and this Court to evaluate and rely on documentary evidence. MBG's testimonial evidence in this case also is not reliable.

For example, both Mr. Ascher and his colleague, Mr. Sinjin Smith, testified under oath that they did not discover Rag & Bone's use of "Miramar" until August or fall of 2025, but in fact, documents produced in the case show that Mr. Smith alerted Mr. Ascher to Rag & Bone's use of the term "Miramar" in March 2025, and *Mr. Ascher's attorney* sent him images of Rag & Bone's

---

[5] None of the communications between Mr. Ascher and Ms. Valero that are included as Exhibits were included in Ms. Valero's document production, even though they were clearly responsive to document requests. Similarly, Exhibit 1 at 53-67 and 92-95 were not produced by Messrs. Waters, Khuu, and Jaffrey. Plaintiffs reasonably believe based on these incomplete document productions from non-party witnesses—each represented by counsel for MBG—that these witnesses may be coordinating with Mr. Ascher to avoid producing evidence favorable to Plaintiffs.

[6] Additional examples of Mr. Ascher's fabrication and attempted fabrication of evidence are described in Appendix A (Exhibit 7).

Miramar Collection products listed on Amazon as far back as *2021*. (*Compare* Exhibit 2 at 12 (158:11-13) (Ascher Testimony), 9 (119:18-22) (Smith Testimony),[7] *with* Exhibit 2 at 17, 21.)

Mr. Ascher dissembled when asked under oath about his manipulation of MBG's website and product offerings: he disclaimed knowledge of the backdated trademark-related "news" articles he posted following Plaintiffs' filing suit, even though documents show that Mr. Ascher had asked ChatGPT to draft and backdate them, and he suggested that the products sold on MBG's website were solely those of licensees, and not those Mr. Ascher participated in designing and selecting. (*Compare* Exhibit 1 at 69 (27:8-18), 88 (310:1-9) *with* Exhibit 1 at 15-22, 25-30, Exhibit 2 at 29.)

When asked about consumer confusion, Mr. Ascher falsely testified that Dale Waters texted him "out of the blue" about Rag & Bone, and specifically stated that he "hadn't talked about Rag & Bone" with Mr. Waters before receiving a text purportedly confusing Plaintiffs' Miramar Collection for a licensing partnership between MBG and Rag & Bone. (Exhibit 1 at 83-84 (214:13-215:6).) As discussed above, Mr. Waters' text was not "out of the blue" and Mr. Ascher had spoken to Mr. Waters weeks earlier about his dispute with Rag & Bone.

Mr. Ascher also gave false testimony during the preliminary injunction hearing. There, Mr. Ascher was asked about his former counsel, Polsinelli, who sent multiple letters on behalf of MBG and represented MBG during the hearing on the Temporary Restraining Order in this case. Specifically, Mr. Ascher testified that "we didn't really engage them" and "[w]e never really hired them." (Exhibit 2 at 10 (Ascher Testimony) (142:3-4), 14 (202:1-3).) MBG's recent document production included its engagement letter with Polsinelli, signed by Mr. Ascher on September 19, 2025. (*See id*. at 34-36.)

These are not isolated examples that can be explained away by carelessness, misunderstanding, or poor memory. The volume of untruths and evasions establishes that the testimony is deliberately false or, at minimum, not probative of the truth. Further, Mr. Ascher is not the only MBG witness who has provided false or misleading testimony. Additional examples of Mr. Ascher's and other MBG witnesses' false or misleading testimony are documented in Appendix B to this letter. MBG's unwillingness to provide truthful (and non-evasive) testimony makes it impossible to remediate the prejudicial impact of MBG's fabricated evidence.[8] Indeed,

---

[7] These citations refer to the transcript of the hearing held on Plaintiffs' motion for preliminary injunction held April 13, 2026, excerpts of which are attached hereto in Exhibit 2 at 2-15. The witness whose testimony is cited is noted in parenthetical. The full transcript is available at ECF No. 144-11.

[8] Plaintiffs anticipate MBG will deny all wrongful conduct in response to this letter, as it has done when confronted with its (now-documented) misconduct to date. But the documentary evidence now plainly reflects MBG's bad faith and disregard for the integrity of these proceedings, illustrating the manifest lack of merit of its claims. MBG and its witnesses have shown an inability to acknowledge and take responsibility for their manipulative and deceitful

Mr. Ascher's testimony that Mr. Waters' text was "out of the blue" clearly shows that Mr. Ascher will corroborate fabricated evidence with false testimony when given the opportunity.

The combination of fabricated evidence and false testimony is the definition of a fraud on the court. The collective misconduct makes the process of discovery—obtaining information to identify facts and truth—impossible, and MBG's bad faith that first motivated and now sustains its continued pursuit of claims against Plaintiffs (and now, ten additional Counterclaim-Defendants) makes the continued litigation of these claims inequitable.

**Spoliated Evidence**

MBG's fabrication of evidence and presentation of false testimony have already forced Plaintiffs to expend substantial resources separating fact from fiction. But the problem extends beyond the evidence MBG has affirmatively manufactured: there is also compelling evidence that MBG failed to preserve *actual evidence* that likely bears directly on this case. Plaintiffs thus face a double prejudice—they must investigate the authenticity of the evidence MBG has produced while simultaneously being deprived of genuine evidence that may be further probative of the merits and MBG's bad faith.

MBG recently produced an image of one of Mr. Ascher's phones containing approximately one million documents, along with an extraction of one of his email accounts containing approximately 600,000 documents. Plaintiffs' e-discovery consultant, Berkeley Research Group ("BRG"), extracted from the phone a log of all sent, received, and missed calls recorded in the phone's native "Phone" and "WhatsApp" applications. (*See* Exhibit 3 at 8 ¶ 24.)[9] Critically,

---

actions, which are antithetical to the fair adjudication of a dispute that was never genuine in the first place. This motion is appropriate now, rather than going through the fruitless exercise of deposing witnesses whose testimony simply cannot be trusted. *See DAG Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09-CIV-7802, 2010 WL 3219292, at *5 (S.D.N.Y. Aug. 12, 2010) (finding dismissal appropriate where "in light of the past pattern of misconduct and lack of admission or remorse, further misconduct seems likely"); *McMunn*, 191 F. Supp. 2d at 462 (dismissal warranted where plaintiff's "lies and misconduct will almost certainly continue in the future if this action is permitted to go forward, thus nullifying any chance for a fair adjudication of the merits of her claim"); *Lawrence v. City of New York*, No. 15-CV-8947, 2018 WL 3611963, at *7 (S.D.N.Y. July 27, 2018) (dismissing case where plaintiff's "deceptive conduct and shifting excuses have completely undermined her credibility" such that the "Court has no way of knowing what story [plaintiff] would offer if this case went to trial").

[9] Plaintiffs retained BRG to assist with the collection and production of Plaintiffs' documents and to collect and process MBG's productions. BRG also conducted a forensic examination of MBG's production and ultimately determined, among other things, that evidence of spoliation existed. BRG's declaration describing its work and findings is attached as Exhibit 3.

however, the phone contained no call records preceding November 24, 2025, because the particular model Mr. Ascher produced retains records of only the 2,000 most recent calls. Had MBG preserved an image of Mr. Ascher's phone when litigation became reasonably foreseeable—*at the latest*, when this action commenced in November 2025, if not when Mr. Ascher first accused Rag & Bone of trademark infringement in August 2025—those earlier, highly relevant phone records could have been preserved.

The earlier missing call records are particularly significant because they concern not only the very time period during which MBG was conducting its campaign to interfere with Plaintiffs' business, but also the time period during which MBG was fabricating evidence. Call records could corroborate the timing and circumstances of communications that MBG has relied upon to advance its claims. For example, a call placed immediately before a purportedly spontaneous text message or email would provide further evidence that the communication was orchestrated rather than genuine. Indeed, both Messrs. Ascher and Kusnetz testified that they spoke by phone immediately before Mr. Kusnetz sent an email professing confusion about Rag & Bone—even though Mr. Ascher had already explained the underlying dispute to him. (Exhibit 1 at 86-87 (292:19-293:11); Exhibit 4 at 3 (196:8-20), 4 (210:5-23).) The call log that might corroborate the circumstances surrounding that communication is among the evidence missing from the image MBG produced.

The missing call records are not an isolated problem. BRG's forensic examination also revealed that Mr. Ascher's phone is missing thousands of text messages sent or received before February 2026, as well as an apparent complete absence of text messages from February 2026 onward. (Exhibit 3 at 13 ¶¶ 44, 45.) Although Mr. Ascher denies deleting anything from his phone, BRG identified some of the missing text messages and concluded that they had been *intentionally deleted*. (*Id.* at 13-14 ¶¶ 46, 47.) That forensic finding directly contradicts Mr. Ascher's insistence that he does not delete messages. More troubling still, Mr. Ascher's own ChatGPT messages reflect that, in November 2025—at the height of his campaign to interfere with Plaintiffs' business and while threatening litigation against Plaintiffs and their business partners—he sought instructions on *how to destroy documents*. (Exhibit 4 at 21-23.) This evidence makes the unexplained absence of relevant communications all the more consequential.

Plaintiffs understand that Mr. Ascher began using a new iPhone in mid-November 2025. (Exhibit 3 at 7 ¶ 22.) But the data on that device is not comprehensively synchronized with the phone MBG produced. Although imaging and producing the newer phone may recover *some* missing information, it cannot restore all of it. (*Id.* at 17 ¶ 55.)

MBG will presumably argue that Plaintiffs' spoliation concerns are premature because it may produce additional documents from Mr. Ascher's newer phone. That argument fails for two independent reasons. First, MBG has already represented to this Court that it produced all relevant communications. As MBG put it, "we're giving them everything…any [communications] are in what's already been produced." (Exhibit 4 at 49 (14:17–19); *see also id.* at 51 (16:3–4) (all responsive emails are "all within the files that were given to Rag & Bone and Katten"); *id.* at 51 (16:17) ("we provided everything we can").) MBG cannot credibly insist that its production is

complete while invoking the possibility of additional documents to deflect scrutiny of the evidence that is missing.

Second, and more fundamentally, the newer phone cannot cure the absence of call records predating November 2025 or recover text messages and other information that were not synchronized to that device. (Exhibit 3 at 5-6 ¶ 15.) Whatever additional information the newer phone may contain, it cannot restore the missing historical data. Whether Mr. Ascher intentionally deleted these records or failed to preserve them in the first place, the result is the same: relevant call and text information from at least August 12 through November 17, 2025—a critical period in this dispute—appears to be irretrievably lost. (*Id.*) That loss was avoidable. MBG had an obligation to preserve relevant evidence once litigation was reasonably foreseeable, and reasonable preservation measures could have prevented it. *ComLab, Corp. v. Kal Tire*, No. 17-CV-1907 (KBF), 2018 WL 4333987, at *7 (S.D.N.Y. Sept. 11, 2018) (duty to preserve evidence arises "when a party should have known that the evidence may be relevant to future litigation"), *aff'd*, 815 F. App'x 597 (2d Cir. 2020).

The scope of the missing data reinforces the conclusion that this is not a minor or isolated gap. The production lacks months of call records, including records of calls that MBG has acknowledged took place, and thousands of text messages. These are not merely theoretical categories of potentially relevant evidence; they are specific forms of evidence bearing directly on the parties' communications during the period when the alleged misconduct occurred. The magnitude and pattern of these omissions strongly support the conclusion that MBG failed to preserve electronically stored information relevant to this litigation.[10]

The prejudice is especially acute when viewed alongside MBG's fabrication of evidence and false testimony. Plaintiffs are left not only to challenge the reliability of the evidence MBG has presented, but also to litigate without the complete body of genuine contemporaneous communications that could expose the full extent of MBG's conduct. MBG should not be permitted to benefit from a situation in which manufactured evidence remains available to advance its claims while potentially critical authentic evidence has disappeared.

**<u>MBG's Anticipated and Actual Violations of Court Orders</u>**

The next layer of misconduct makes this case an even greater candidate for severe sanctions. MBG and its counsel have violated the Protective Order in this case (ECF No. 73), and casually discussed the prospect of violating the Temporary Restraining Order (ECF No. 20) to obtain leverage in the litigation. Their lack of respect for the judicial process is on full display in

---

[10] MBG was on notice of anticipated litigation no later than August 2025, when it sent its initial cease-and-desist letter. It therefore had an obligation to preserve relevant evidence during the highly material August–November 2025 period.

both instances, which in and of itself warrants the sanctions requested here; indeed, any lesser response likely would fail to curb their improper behavior.[11]

With respect to the Protective Order, counsel for MBG sent the entirety of Plaintiffs' document production to Mr. Ascher, including documents designated "Attorney's Eyes Only." (Exhibit 5 at 2.) After instructing Mr. Ascher not to review documents designated "Attorney's Eyes Only," counsel for MBG then told Mr. Ascher that he could, in fact, "review and see if there is anything great in there," but would "have to DENY seeing this stuff later if asked." (*Id.* (emphasis in original).) Mr. Ascher later sent an email indicating that he did not open and would not review the production. (*Id.*) Plaintiffs have good reason to doubt the truthfulness of Mr. Ascher's response, given his demonstrated pattern of dishonesty.

When counsel for Plaintiffs notified counsel for MBG of its violation of the Protective Order, counsel for MBG stated that Mr. Ascher was never provided a "functional link" to the production, but that is inconsistent with his instruction to Mr. Ascher to review the provided document production. (*Id*. at 7-10.) When asked to provide declarations or corroborating evidence to support counsel for MBG's denial of the Protective Order violation, MBG failed to do either. (*Id*. at 9-14.)[12]

As for the Temporary Restraining Order, on August 24, in advance of a meeting with a Nordstrom executive, Mr. Ascher asked counsel for MBG "should I cut a deal with him [Nordstrom] that no MIRAMAR be used for clothing Search [sic] at Nordstrom?" (Exhibit 5 at 17.) While counsel for MBG apparently instructed Mr. Ascher not to make this deal (at least not without his presence), he also advised Mr. Ascher to "see if there is any willingness to put pressure on RB to settle with us and pay for a license for all goods sold and to be sold." (*Id.*) While both counsel for MBG and Mr. Ascher deny ever following through with this conversation with Nordstrom, both of their anticipated actions would be violations of this Court's Temporary

[11] To that point, counsel for MBG has been sanctioned by other courts numerous times. *See, e.g., Iconic Mars Corp. v. Kaotica Corp.*, No. 22-CV-0092-CAB-DEB, 2025 WL 2440887, at *8 (S.D. Cal. Aug. 25, 2025) ("This conscious disregard for facts and law demonstrated by Mr. Lobbin in this case is unfortunately not an aberrant occurrence.").

[12] Counsel for MBG also attempted to deflect his violation of the Protective Order by accusing Plaintiffs of over-designating documents as "Attorney's Eyes Only." (*See* Exhibit 5 at 9-14.) Although Plaintiffs designated less than 5% of their document production "Attorney's Eyes Only," they took immediate action to review not only the documents counsel for MBG identified, but others as well, and determined that while certain documents could be re-designated as "Confidential" (*see id.* at 15-16), other documents require "Attorney's Eyes Only" designations because: (i) Mr. Ascher has proven he seeks to disrupt Plaintiffs' business; and (ii) Mr. Ascher is a daily user of ChatGPT (an open format AI) and uses it frequently for this case, which could expose Plaintiffs' documents to others. Regardless, MBG's response in no way justifies a violation of the Protective Order.

Restraining Order, which prohibits any interference with Plaintiffs' sale and distribution of their Miramar Collection. (ECF No. 20 ¶ 10.)

[redacted]

[redacted]

[redacted]

[redacted]

13 [redacted]

[redacted]

[redacted]

*　　　*　　　*　　　*　　　*

To determine whether case-ending sanctions are appropriate, a court must ask: "(1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future." *McMunn*, 191 F. Supp. 2d at 446. The facts here establish that MBG's misconduct rises to the level of a pattern of intentional bad faith that was *never* corrected; indeed, MBG continues to rely on fabricated evidence and false testimony in its newly filed Counterclaims, despite Plaintiffs' calling it into question months ago. (*See* ECF No. 98.) Based on MBG's continued denials and bad faith behavior, that misconduct will likely continue into the future. MBG's behavior not only prejudices Plaintiffs' position and has forced them to spend a substantial amount in legal fees investigating MBG's bad faith allegations and attempting to ferret out fact from fiction, but it also undermines the judicial process: it is an affront to this Court and the fair administration of this dispute.[14]

Accordingly, Plaintiffs respectfully request the Court: (i) enter a default judgment against MBG in their favor, including a permanent injunction prohibiting MBG from interfering with Plaintiffs' sale and promotion of their Miramar Collection; (ii) dismiss with prejudice MBG's Counterclaims; and (iii) award attorneys' fees to compensate Plaintiffs for their expenses arising from MBG's misconduct, including, but not limited to, expenses incurred in uncovering MBG's misconduct and having to engage in depositions and motion practice based on falsified evidence.

---

[14] In its recently-filed Reply in Support of its Motion for Preliminary Injunction, MBG concedes "[t]his Court should hold firm on exercising its equitable discretion only in favor of parties demonstrating integrity and complete truthfulness in key representations of fact to the Court." (*See* ECF No. 161 at 5.)

While this motion remains pending, Plaintiffs further request a stay of all deadlines in this case.

Respectfully submitted,

*/s/ Mark T. Ciani*
Mark T. Ciani

Cc: Counsel of Record